C. L. ABERNETHY et al. v. JOHN H. GODETTE et al.

(Filed 15 March, 1922.)

**Attorney and Client—Contracts—Fees—Evidence—Recovery—Questions for Jury—Trials.**

Where there is evidence tending to show that after an attorney had been engaged professionally by his client, they entered into an agreement as to the amount of compensation to be paid, owing to the fiduciary relationship of the attorney, the parties are not on equal terms; and the reasonableness of the amount agreed upon may be inquired into by the jury, upon the evidence; and an instruction that the client will be bound by their agreement, excluding an inquiry into the reasonableness of the fee, is reversible error. *Stern v. Hyman*, 182 N. C., 422, and *Casket Co. v. Wheeler*, 182 N. C., 459, cited and applied.

Appeal by defendants from *Lyon, J.*, at November Term, 1921, of Craven, in an action to recover the face value of a promissory note. From a verdict and judgment in favor of plaintiffs, the defendants appealed, assigning errors.

*Ward & Ward and Charles R. Thomas for plaintiffs.*
*E. M. Green and R. A. Nunn for defendants.*

Per Curiam. The note upon which this suit is brought, as alleged in the complaint, "was made, executed, and delivered by the defendants to the plaintiffs for balance due for professional services rendered, and to be rendered by the plaintiffs, as attorneys, to the defendant John H. Godette, at the special instance and request of both of the defendants, John H. Godette and J. W. Belangia."

Briefly, the circumstances under which said note was signed and delivered were as follows: In December, 1918, John H. Godette was a deserter from the United States Army, hiding out or concealing himself in the woods of Craven County. He sent his codefendant Belangia to New Bern to employ counsel to represent him and to assist in getting him out of his trouble. Belangia called upon the plaintiffs, and we now quote from the testimony of Mr. Abernethy:

43—183

"Mr. Belangia came to our office and said, 'I have a colored man that I am interested in, and I want you to see if you can get him out of trouble.' I asked him what kind of trouble he was in, and he told me he had left camp—deserted. I said, Mr. Belangia, it is a difficult thing to do, and I don't like to engage in that kind of business. It will cost you a good deal of money. In the first place, I have got to take your boy to camp, it is a long trip, I am just as busy here in the office as I can be at this time, and, more than that, it subjects a man, more or less, to criticism, but I am in the practice of law for legitimate business, and I will do it if you folks will pay the price. He asked me what it would cost him, and I said, it will cost you at least $3,000. He replied, 'That is too much.' About that time Mr. Willis came in the office and we talked it over, and we agreed on a price of $2,000. I said, the only way is to take this boy back to camp and lay our cards on the table. Mr. Belangia said that looked to him like the only thing to do. He said he would carry us down to where this fellow was. Late that afternoon he got one of these coffin Fords and a colored man and started Mr. Willis and me down to Harlowe. It was a dark, rainy day and night came on pretty soon. He took us to a colored man's house on the road near Harlowe, and, when we went in, there was John sitting in there, calm and serene. I had known John before. Mr. Belangia did most of the talking, and said to him: 'I have arranged with this man to get you out of this trouble, how much money have you got?' John then begun to pull bills out—they were pinned with safety pins all around in his clothes. He pulled out four or five hundred dollars, and said that was all he had. Mr. Belangia said to him, 'Well, I will lend you some,' and he went down in his jeans and turned it over to Mr. Willis and me. I never had so much money in my life. He then said, 'What are you going to do about this other thousand?' They had made up a thousand right there. I said, 'Have you any property?' He then said he would sign a note with John for the other thousand. I said, 'We will have to discount the note or get the money on it from the bank.' I then tore a leaf out of some kind of a book there and Mr. Willis had a fountain pen. I wrote the note, I think, and they signed it, and we left. I told John I thought it was best for him not to go to New Bern. I said, 'I think you had better join me tomorrow night and I will take you on to Charlotte.' . . . When we arrived at camp I was introduced to the Judge Advocate. Some of his people lived in New Bern, and we talked about that for a little while, then I said to him, 'Judge, I don't reckon you ought to charge this fellow with desertion; he just got ready to leave and left.' I told him I had the negro out there in the automobile. He said, 'I expect we can fix it up, but you will have to deliver your man.' I called John in and he said, 'Boss, I just went home because my folks

were sick.' I said, 'Judge, Mr. Willis tried to get John exempted from the draft on the theory of age; he can send you the papers. I said, 'You know the negro's character.' He answered, 'Well, that is all right; you can go on back and I will look out for John.' I went on to Washington to attend to some business matter there, and when I got home John was there with an honorable discharge and $60 bonus, so Mr. Belangia said."

Cross-examination: "We went down to 'Dove's house that night, wherever it was, and met John, and collected $1,000 and got the note. The next time I saw him was when he met me on the train at Clark's and I carried him to Charlotte. . . . We were in Charlotte all day long. I stopped at the Selwyn Hotel, and I arranged with the cook there to feed John, and some time in the afternoon I carried John out to the camp. I left Charlotte some time that night, and the next time I saw John he was back home. The service that I rendered him was that I got him released of this charge and got an honorable discharge. The man gave me to understand that he would take care of him. I expected to see John in a few days. They said if they needed me they would let me know."

In regard to the reasonableness and amount of plaintiffs' charges, his Honor instructed the jury as follows:

"Now, something has been said about exorbitant charges. You have nothing to do with that. The people have a constitutional right to make contracts, and if they make a bad or unfortunate contract when there is no fraud or misrepresentation it is enforceable against them. You have nothing to do with the charge. That is a matter between the parties who enter into a contract."

To this instruction the defendants except and assign same as error. We think the instruction was erroneous under the doctrine announced in *Stern v. Hyman*, 182 N. C., 422. It will be observed that the note was given "for services rendered and to be rendered." There is evidence, other than that quoted above, tending to show that the relation of attorney and client existed at the time of and prior to the agreement which resulted in its execution. This is not admitted by the plaintiffs, but the circumstances are such as to require a submission of the question to the jury. Of course, the instruction was correct, if no fiduciary relation existed at the time. *Casket Co. v. Wheeler*, 182 N. C., 459; Elliott on Contracts, sec. 2866.

New trial.